Filed 12/2/25  P. v. Ramirez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN SILVA RAMIREZ,<br><br>    Defendant and Appellant. | B336730<br><br>(Los Angeles County<br>Super. Ct. No. NA093863) |


APPEAL from an order of the Superior Court of Los Angeles County, Richard M. Goul, Judge.  Affirmed.

Patricia S. Lai, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

John Silva Ramirez (defendant) appeals from the trial court's postjudgment order denying his petition for resentencing under Penal Code section 1172.6.[1]  The court denied the petition without issuing an order to show cause, concluding defendant was ineligible for relief because he was convicted as the actual killer.  Based on our independent review of the record, we agree and affirm the order.

## STATEMENT OF THE CASE

On May 2, 2013, defendant and his brother, codefendant Jose Trinidad Ramirez,[2] were charged by information in Los Angeles County with the murder of Martin Contreras (§ 187, subd. (a); count 1).

Defendant was charged separately with one count of possession of a firearm by a felon (§ 29800, former subd. (a)(1); count 2).

As to count 1, it was alleged defendant personally and intentionally discharged a firearm, causing great bodily injury and death (§ 12022.53, subd. (d)).  As to each of the counts, it was alleged the offense was committed for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1)(C).)

It was further alleged defendant served one prior prison term (§ 667.5, subd. (b)), had one prior serious felony conviction (§ 667, subd. (a)) and suffered one prior strike pursuant to the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

On July 1, 2015, the jury found defendant guilty of first degree murder in count 1 and possession of a firearm by a felon in count 2.  As to the murder, the jury found true the allegation that defendant personally and intentionally discharged a firearm,

---

[1]     All further undesignated statutory references are to the Penal Code.

[2]     As defendant, brother, father, and others mentioned at trial share the same surname, we refer to each such person either by party designation or first name to avoid confusion.

2

causing great bodily injury and death. As to each offense, the jury found true the allegation the offense was committed for the benefit of a criminal street gang.

On September 29, 2015, the trial court sentenced defendant to state prison for 80 years to life. In 2017, this court affirmed the judgment of conviction. (*People v. Ramirez* (Oct. 4, 2017, B267429) [nonpub. opn.] (*Ramirez I*).)

On June 14, 2023, defendant filed a petition for resentencing pursuant to section 1172.6. The trial court appointed counsel for defendant and received briefing from the parties. On February 9, 2024, the court conducted a prima facie hearing. Thereafter, the court denied the petition without issuing an order to show cause, finding defendant was convicted as the actual killer rendering him ineligible for relief as a matter of law.

On the same day, defendant filed a notice of appeal.

## STATEMENT OF FACTS

The facts of this case were set forth in detail in *Ramirez I.* They are as follows.

**Prosecution evidence**

Shortly after midnight on April 20, 2012, Contreras, Jose, and others, including defendant and Jose's father Miguel Ramirez, were drinking at a bar they all frequented. Jose and Contreras argued inside the bar, and Jose mentioned the Westside Longo gang several times. Jose told Contreras and his companions repeatedly they were in his neighborhood and they should respect that fact.

A short time later, as Contreras and others were leaving the bar, Jose followed them out and spoke to Contreras. Soon the two came to blows. After being summoned from inside the bar, Miguel came out and hit or kicked Contreras. Contreras responded by hitting Miguel with a backhand, causing Miguel to fall to the ground and lose consciousness. The bar security guard sprayed pepper spray into the air surrounding the combatants. Contreras ran away in one direction, and Jose's companions ran

3

in another.  Jose ran to his white Ford pickup truck.  Three friends of Contreras (Julio V., Orlando M., and Christian L.) left in Julio's car to find Contreras.

His friends found Contreras a short time later in front of his house washing off pepper spray with a hose.  As Orlando and Christian got out of Julio's car, Jose arrived in his white truck and parked behind Julio's car.  Jose got out of the truck holding a steel pipe about the size of a baseball bat and told Julio not to move.  Jose asked whether they had been hanging out with Contreras, and said such things as, "You mother fuckers, you're going to pay; this is not going to end like this."  Christian ran off as a black Dodge Ram pickup truck arrived on the scene and parked behind the white truck.  Orlando testified that he saw "Johnny," or defendant, emerge from the black truck, before he too ran off.  Julio, still seated in his car, and Orlando both heard a gunshot.  Julio testified that it came from behind him and described it as sounding very close.

At the time of the shooting Contreras and Erika Silva (Silva) lived together with their four children and her two cousins.  Silva woke up around 1:16 a.m. to the sounds of people arguing.  She then heard a gunshot and went to investigate just as Contreras came in, bleeding from his waist, near his right hip.  He said he had been shot, and he did not want to die.  He was breathing hard and appeared scared.  Silva called 911, and at the operator's direction asked Contreras who had shot him.  Silva replied to the operator that Contreras named "Johnny."

Silva later heard Contreras tell a police officer it was Johnny Ramirez who shot him.  Silva did not know who Johnny Ramirez was, although she knew Jose since Contreras had worked for him.  Long Beach Police Officer Harrison Moore testified he was one of the first officers on the scene after the shooting and had questioned Contreras in English as he lay wounded on the couch.  Contreras was groggy and answered in English slowly and with difficulty as he slipped in and out of consciousness.  In response to Officer Moore's question who had

4

shot him, Contreras replied, "Johnny Ramirez," adding Johnny was 31 and had left in a two-door black Dodge Ram pickup truck.

Elizabeth C. testified her friend Johnny, whom she identified as defendant, was visiting her at her apartment between midnight and 1:00 a.m. on the night of the shooting. After receiving a call just before 1:00 a.m., defendant left saying he had to go handle something because Jose and father had gotten into a fight. He returned about 20 or 30 minutes later, banging on the door loudly "like he was a cop," saying let me in until she opened the door. He appeared "jibbery" and paced nervously until a car arrived to collect him a few minutes later, about 1:20 or 1:30 a.m.

Defendant's cell phone records for the night of the shooting were admitted by stipulation. Defendant's cell phone and Jose's cell phone were both used at or near the scene of the shooting between 12:56 a.m. and 1:14 a.m. Jose's phone called defendant's phone at 12:56 a.m., 12:57 a.m., 12:58 a.m., and 1:14 a.m., and one call was made from defendant's phone to Jose's phone at 1:01 a.m. All calls were answered.

Retired Deputy Medical Examiner, Dr. Lisa Scheinin, testified she performed the autopsy, and determined a large caliber bullet entered Contreras's body from behind, although not so directly behind as to rule out the possibility that Contreras could see the shooter. The location of the wound was consistent with an attempt to turn away upon seeing a gun. The bullet entered the soft tissue near the right hip, traveled slightly downward into the pelvis, through the pelvic area, and stopped in the soft tissue of the left groin. The bullet damaged an artery and two veins, and despite surgery to repair them, Contreras died of his gunshot wound about 20 hours later.

After Contreras was taken to the hospital, Silva telephoned Maria, whom she considered her sister-in-law, as Maria's husband, Juan Barajas, was Miguel's nephew and defendant's cousin. Barajas testified that sometime between 1:00 a.m. and 3:00 a.m., defendant came to his home and told Barajas to tell his wife to remain silent, that defendant's name could not get around

because he had problems with the police.  Defendant showed Barajas his tattoos and said he was a "soldier" in his gang, adding that as a gang member, all he had to do was to give an order to have Barajas and his family killed if they said anything. Defendant also explained he had done what he had done because of his father, and then left.  Barajas testified he had already known defendant was a member and soldier of the Westside Longo gang.  Later that afternoon, Barajas told defendant Contreras had been gravely injured and was going to die. Defendant replied the shot they had given him was not enough for him to die.

Sometime after the night of the shooting, Julio, Christian, and another friend were parked at a liquor store when Jose drove up, blocked their car, and said what had happened to Contreras was nothing compared to what would happen to them if they said anything.  Defendant then arrived in another car, said that this was his "hood," to remain quiet about what had happened, and all would be fine.

Defendant and Jose were arrested in November 2012.  A black Dodge Ram truck registered to defendant and a white Ford F-250 truck registered to Jose were seized.  No gun was located.

Jose was placed in a cell with an informant, their conversations were recorded, and over an hour of the recordings were played for the jury, with occasional explanations by the investigating officer, Detective Teryl Hubert.  Among other things, Jose told the informant his brother was a "rider," and he telephoned his brother "to have this fool hit," and to tell him "this fool needs to go down" and "be gone."  Jose did not directly say his brother or defendant shot Contreras, but when the informant asked whether "you shot that fool," Jose replied "Nah"; and replied "yes" when the informant asked, "Your brother?"  Jose then said his brother was being blamed, but it was "some other fool," a "homeboy" who was never arrested and was unknown to the police.  Jose said the gun used was a revolver, which was disposed of by his brother.

The prosecution's gang expert, Long Beach Police Detective Chris Zamora, testified with regard to gang culture in general, and in particular, the culture, primary activities, membership, common signs and symbols of the Westside Longo criminal street gang. Given a hypothetical question mirroring the facts in evidence in this case, Detective Zamora expressed his opinion that the crime described would have been committed for the benefit of and in association with Westside Longo.

Detective Zamora testified to being familiar with defendant and Jose, and that in his opinion, they were both members of Westside Longo. He based his opinion on both men's prior law enforcement contact, their gang-related tattoos and the facts surrounding the investigation in this case. Detective Zamora explained the gang-related tattoos to the jury as photographs of the tattoos were shown. On defendant's chest was "West" and "LB," which Detective Zamora said was indicative of Westside Longo. Above it were two lines with three dots on top, which was a Mayan numbering symbol, signifying that Westside Longo was a "Sureño" gang, subservient to the Mexican Mafia prison gang. One must earn the privilege of wearing such a symbol by putting in work for the gang, meaning the commission of violent assaults. Detective Zamora also explained that "rider" is a term in Sureño criminal street gangs that refers to an active member of the gang who puts in work for the gang.

**Defense evidence**

The defense presented testimony of its own gang expert, Martin Flores, who opined that rather than showing a gang-related crime, the hypothetical facts described for Detective Zamora indicated a family dispute and a shooting to benefit the family name, not a gang. He agreed defendant's tattoos were gang related, but did not agree the evidence demonstrated defendant was an active member of the gang at the time of the shooting. He noted gang members did not necessarily have tattoos removed upon leaving the gang. Flores noted it was common for jail inmates to lie or exaggerate the reasons for their arrest and incarceration. Flores also testified that "rider" can

7

have many meanings, including the more benign meaning of "buddy."

## DISCUSSION

Defendant argues the trial court erred in denying defendant's petition for resentencing at the prima facie stage because the record of conviction did not establish as a matter of law that defendant was ineligible for relief.

## I.     Applicable law and standard of review

In 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to ensure a person's sentence is commensurate with his or her criminal culpability.  (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843, superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)  The bill amended section 188 by adding a requirement that, except as stated in section 189, subdivision (e), all principals to murder must act with express or implied malice to be convicted of that crime.  (§ 188, subd. (e)(3).) It amended section 189 by adding a requirement to the felony-murder theory that defendants who were not the actual killer or a direct aider and abettor to the felony with intent to kill must have been a major participant in the underlying felony and acted with reckless indifference to human life.  (§ 189, subd. (e).)

Section 1172.6 established a procedure for defendants already convicted of murder under the old law to seek resentencing in the trial court if they believe they could not now be convicted of that crime given the above amendments to sections 188 and 189.  If a petitioner is not ineligible as a matter of law, then an order to show cause should issue and the trial court may hold an evidentiary hearing.  The court sits as the fact finder and the prosecution has the burden of proving beyond a reasonable doubt that the defendant is guilty of murder or attempted murder under the amended law.  (§ 1172.6, subd. (d)(3); *People v. Lewis* (2021) 11 Cal.5th 952, 960 (*Lewis*).)

8

At the prima facie stage of the petition process, the trial court may not engage in factfinding about the petitioner's culpability, but should deny a petition if it is clearly meritless as a matter of law. (*Lewis, supra,* 11 Cal.5th at p. 971.) In making this determination, the court should consider the petitioner's record of conviction. (*People v. Curiel* (2023) 15 Cal.5th 433, 462–471 (*Curiel*).) "'[I]f the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner,"'" and deeming him ineligible for resentencing. (*Lewis,* at p. 971.)

A petitioner is ineligible for resentencing if the record of conviction shows he was convicted of murder, attempted murder, or manslaughter under any theory of liability that remains viable under Senate Bill 1437. When a defendant is convicted as the sole and actual perpetrator of a murder or attempted murder, he is ineligible for resentencing as a matter of law. (*People v. Delgadillo* (2022) 14 Cal.5th 216, 233.)

Whether a section 1172.6 petition established a prima facie case for relief is a purely legal question, which we review de novo. (*People v. Lovejoy* (2024) 101 Cal.App.5th 860, 865.) We thus need not consider the precise reasoning of the trial court and may affirm on any ground. (*Curiel, supra,* 15 Cal.5th at p. 471.)

## II.    Relevant trial court proceedings

At trial, witnesses to the shooting described a single gunshot. The medical examiner found the victim died from a single gunshot wound to the pelvis and abdominal area.

The trial court instructed the jury on multiple theories, including direct aiding and abetting; the natural and probable consequences theory of aiding and abetting, with the target crime of assault, assault with a deadly weapon, or assault with a firearm; first and second degree murder with malice aforethought; first degree premeditated murder; and the natural and probable consequences theory of coconspirator liability in which the object of the conspiracy was the uncharged crime was assault, assault with a deadly weapon, or assault with a firearm.

9

Of the two defendants at trial (defendant and codefendant Jose), only defendant was alleged to have personally used and discharged a firearm. The prosecutor repeatedly maintained defendant was the actual killer, highlighting the evidence in the record suggesting defendant was the sole shooter and actual killer. This included evidence from Silva, who testified when asked who shot him, Contreras replied "Johnny." Contreras also informed police at the scene that "Johnny Ramirez" had shot him. In addition, there was Elizabeth C.'s testimony that defendant appeared "jibbery" after Contreras had been shot. The prosecutor argued, "[Defendant] acts jibbery because he has just shot the victim." The prosecutor also highlighted Jose's statements to the informant in jail, in which Jose admitted he called defendant and told him to "have this fool hit." The prosecutor emphasized in closing argument, "Jose . . . is not the shooter. That's the shooter, [defendant]."

In discussing the gun allegations during closing argument, the prosecutor explained the personal firearm use and discharge allegations only pertained to defendant. The prosecutor specified: "There is an allegation that [defendant] personally and intentionally discharged a firearm, causing great bodily injury or death to Martin Contreras. That he intentionally discharged it, and he used it. Those are alleged only as to [defendant] because he is the shooter in this case." The prosecutor further explained:

"There's [*sic*] gun allegations. Discharge causing death is the most important one. And there are two kinds of gun allegations. I'll get into it in detail, but the essence of it is one of them is an allegation as to [defendant] only; that he personally did the shooting. The other one is an allegation that applies to both defendants that says if you find the gang allegation true, and you just have to find whether a principal in the crime fired the gun who killed Martin Contreras. What that does is that can make a gun allegation applicable to Jose . . . even though we know that he's not the shooter. It is [defendant]."

The prosecutor urged the jury to find defendant guilty as the shooter, and to find the principal-armed allegation true as to Jose.

On July 1, 2015, the jury found defendant guilty of first degree murder in count 1. The jury found true the allegations defendant personally and intentionally discharged a firearm, which caused great bodily injury and death to Contreras, and personally used a firearm.

## III. Relevant section 1172.6 proceedings

During the section 1172.6 proceedings, the prosecution maintained defendant was ineligible for relief as a matter of law based on the prosecution's theory of the case and the jury's true finding as to the allegation that defendant personally discharged a firearm causing great bodily injury and death.

The defense argued a prima facie case for relief had been stated, arguing a true finding on the firearms enhancement did not preclude relief under Senate Bill 1437. Defendant argues the section 12022.53, subdivision (d) enhancement relates only to the act and does not establish a sufficient mens rea for murder.

The trial court denied relief at the prima facie stage, finding "it seems clear . . . beyond a reasonable doubt that the defendant was—[defendant] was the actual killer in this case. Otherwise, they could not have found him guilty with the special allegation that they found true. [¶] So in this case the court finds that defendant was the actual killer and, therefore, has not met his prima facie burden."

## IV. The record of conviction establishes defendant is not eligible for relief under section 1172.6

The record conclusively shows defendant was convicted under the theory he was the actual perpetrator of the murder who acted with malice. This theory remains valid, thus defendant is ineligible for relief as a matter of law.

We independently review the record of conviction to determine whether a prima facie showing has been made. (*Lewis, supra*, 11 Cal.5th at p. 971.) Here, the first degree murder verdict, the true finding on the personal-discharge

11

firearm allegation, and the trial record show defendant was convicted as a direct perpetrator who acted with malice.

The jury was instructed that murder is an unlawful killing with malice aforethought and that the following elements must be proven: (1) the defendant committed an act that caused the death of another person; and (2) when the defendant acted, he had a state of mind called malice.

The jury was further instructed that malice may be either express or implied. Express malice was defined as the defendant acting unlawfully with intent to kill. Implied malice was defined as: (1) the defendant intentionally committed an act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time defendant acted, he knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life.

We may also consider the prosecution's theory and the trial evidence, because the underlying question of whether defendant is eligible for relief is based on "*the factual findings* [the jury verdicts] *necessarily reflect*." (*People v. Morales* (2024) 102 Cal.App.5th 1120, 1131 (*Morales*); see also *People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1247 ["reading all the charges, the instructions, the verdicts, and the findings as a whole, we see no legal route Beaudreaux's jury could have taken to convict him without finding he was [the victim's] actual killer"].)

Viewing the record as a whole, the jury's verdict that defendant was guilty of first degree murder and he personally discharged a firearm causing great bodily injury or death, render him ineligible for relief under section 1172.6.

Defendant argues because (1) the complaint or information allowed the prosecution to proceed under the natural and probable consequences doctrine or uncharged conspiracy theory under which malice was imputed and (2) defendant was convicted of murder following a trial, it cannot be said he was ineligible as a matter of law. Instead, defendant argues, the jury instructions allowed the jury to conclude that an aider and abettor could be guilty of first degree murder under the natural and probable

12

consequences doctrine or the uncharged conspiracy liability instruction. There was no express finding that would show defendant's ineligibility as a matter of law, such as a true finding as to premeditation. Further, defendant argues, because the trial court did not instruct that vicarious murder liability as a consequence of the conspiracy could not be first degree murder, the jury could have convicted defendant of first degree murder as a coconspirator without personally harboring an intent to kill.

Defendant cites *People v. Offley* (2020) 48 Cal.App.5th 588 (*Offley*) as support for his position. In *Offley,* at least three individuals fired shots into a vehicle, killing one person and seriously wounding another. (*Id.* at p. 592.) Offley and Keller were two of five defendants charged with taking part in the crime. Both Offley and Keller were convicted of one count of murder, one count of attempted murder, and one count of shooting at a motor vehicle. (*Id.* at p. 593.) Offley was convicted of second degree murder, and Keller was convicted of first degree murder. The jury found that Offley personally and intentionally discharged a firearm causing great bodily injury or death under section 12022.53, subdivision (d). As to Keller, the jury found a principal to the crimes, but not Keller himself, fired the weapon. (§ 12022.53, subds. (d) & (e)(1).) Both Offley and Keller filed petitions for resentencing under section 1170.95 (since renumbered to § 1172.6), which the trial court denied at the first stage of review on the ground that the jury found both defendants personally fired a weapon and proximately caused great bodily injury or death. (*Offley,* at p. 597.)

The *Offley* court reversed, finding an enhancement under section 12022.53, subdivision (d) does not preclude relief because it does not show that a defendant acted with malice aforethought. (*Offley, supra,* 48 Cal.App.5th at p. 598.) The *Offley* court noted section 12022.53 is a "general intent enhancement," which "does not require the prosecution to prove that the defendant harbored a particular mental state as to the victim's injury or death." (*Offley,* at p. 598) However, the *Offley* court acknowledged, "Of course, the trial court may look beyond the abstract of judgment

13

and consider the entire record of conviction, . . . in determining whether a petitioner has made a prima facie case of eligibility. . . . In many instances, additional information from the record will establish that a defendant's conviction was not based on the natural and probable consequences doctrine, and that the jury must have convicted the defendant on the basis of . . . malice aforethought." (*Id.* at pp. 598-599.) The court noted that in that particular case, the court could not rule out the possibility that the jury relied on the natural and probable consequences doctrine in convicting Offley. (*Id.* at p. 599)

Here, in contrast, the record rules out any suggestion defendant was convicted under a natural and probable consequences theory or a conspiracy theory. The prosecution relied on a theory that defendant was the actual killer, and his brother Jose was guilty as an aider and abettor. The evidence exclusively pointed to a single shot being fired, which ultimately caused the victim's death. Although defendant's trial defense involved a suggestion that an unidentified third party shot the victim, the jury necessarily rejected such a theory by finding true the allegation defendant personally and intentionally discharged a firearm causing great bodily injury and death. The actual killer in a murder is ineligible for section 1172.6 relief as a matter of law. (*People v. Delgadillo, supra,* 14 Cal.5th at p. 233.)

Defendant also relies on *In re Ferrell* (2023) 14 Cal.5th 593 (*Ferrell*). The case does not assist defendant. In *Ferrell*, there was evidence 17-year-old Ferrell "'shot one time into the air, and the second time it just went off.'" There was also evidence Ferrell was trying to break up a fight at the time. (*Id.* at p. 598.) There was eyewitness testimony Ferrell's first shot was into the air, and the gun was not aimed at anyone. Two witnesses observed Ferrell run to the victim and apologize, saying he didn't mean to do it. (*Ibid.*) The jury was instructed on a felony-murder theory, among other theories, and Ferrell was found guilty of second degree murder. (*Id.* at p. 599.)

Ferrell sought a writ of habeas corpus, arguing his jury received instructions which allowed them to convict on an invalid

14

theory of second degree murder. (*Ferrell, supra,* 14 Cal.5th at p. 600.) In its discussion of harmless error, the *Ferrell* court concluded that the jury's finding that Ferrell discharged a firearm and caused death under section 12022.53, subdivision (d), failed to establish the mental component of implied malice. Instead, the jury could have found Ferrell shot his friend while trying to stop a fight without believing he was shooting towards any person. (*Ferrell,* at p. 597.)

Here, the jury was instructed on the required element of malice. Its finding defendant was guilty of first degree murder necessarily included a finding of malice. Further, in this case, where the facts showed a targeted killing of a specific individual, with only one shot fired by defendant, the record precludes defendant's eligibility under section 1172.6.

Finally, defendant relies on *Curiel,* which is also unhelpful to defendant. *Curiel* involved a confrontation between rival gang members including arguments and pushing. (*Curiel, supra,* 15 Cal.5th at p. 433.) The defendant's companion took out a gun and shot one of the rival group. (*Id.* at p. 442.) At trial, the prosecutor argued the defendant instigated the confrontation and was there for backup. (*Id.* at p. 445.) The jury convicted the defendant of first degree murder and found true gang-murder special circumstance allegations. (*Id.* at p. 447.) Following the enactment of Senate Bill 1437, the defendant petitioned the court for resentencing, arguing he had been convicted of first degree murder under a natural and probable consequences theory. In response, the prosecution argued the jury's true finding on the special circumstance allegation rendered the defendant ineligible for relief, because the gang-murder special circumstance included an element of intent to kill. (*Curiel,* at p. 447.) The *Curiel* court granted review to address "whether and under what circumstances a jury's finding of intent to kill renders a defendant who seeks relief under Senate Bill 1437 . . . ineligible as a matter of law." (*Curiel,* at p. 448.)

Here, in contrast, there was no dispute defendant fired the single shot that struck and killed the victim. The jury found not

15

only defendant had intent to kill, but necessarily found him guilty as the actual killer.  Because the only theory of murder liability provided to the jury for actual killers was malice murder, the jury found all the elements necessary for a direct perpetrator for the crime of murder.

*Morales* is instructive.  In *Morales*, the defendant had been convicted of attempted premeditated murder in conjunction with a robbery of an armored truck.  (*Morales, supra,* 102 Cal.App.5th at pp. 1123–1128.)  Although Morales argued his companion at the time fired the shots at the driver of the armored truck, the jury did not credit this defense, finding true allegations that Morales personally discharged a firearm and caused great bodily injury during the commission of the robbery and attempted murder.  (*Id.* at pp. 1127–1128.)  Under these circumstances, the trial court did not err in denying Morales's petition for resentencing despite the fact instructions were given on the natural and probable consequences doctrine.  The *Morales* court explained the jury's verdict precluded Morales's eligibility for resentencing in spite of the natural and probable consequences instruction: "these guilty verdicts were not the jury's only findings regarding the robbery and attempted premeditated murder of [the victim].  The jury also found Morales guilty of assault with an assault weapon and found true the allegation under section 12022.53(d) that Morales personally and intentionally discharged a firearm and caused great bodily injury in the commission of the robbery and attempted premeditated murder of [the victim].  This means the jury made the factual finding that Morales was the robber who shot [the victim] multiple times with an AK-47 semiautomatic rifle."  (*Id.* at pp. 1131–1132.)

Similarly, here, the jury's finding defendant personally and intentionally discharged a firearm, causing great bodily injury and death to Contreras, means the jury made the factual finding that defendant fired the single shot that killed Contreras.  Given the circumstances of this case, we are confident the jury

16

necessarily made all the factual findings required to establish defendant is guilty of murder as the actual shooter.

## V.     No due process violation occurred

Defendant argues section 1172.6 creates a liberty interest protected by the due process clause, and erroneous denial of defendant's petition at the prima facie stage therefore violates due process.  (U.S. Const., 5th & 14th Amends., citing *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346.)

To the extent there is a state-created due process right under section 1172.6, such a right only exists if the defendant meets the eligibility criteria under the statute.  Because he is ineligible for relief as a matter of law, defendant's argument he was deprived of a state-created due process right fails.  (*People v. Fisher* (2023) 95 Cal.App.5th 1022, 1030, fn. 7.)

## DISPOSITION

The order is affirmed.


CHAVEZ, J.


We concur:


LUI, P. J.


RICHARDSON, J.